IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

MICHIGAN DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND
ENERGY; AND THE MICHIGAN
DEPARTMENT OF NATURAL RESOURCES,

No.  1:20-CV-528

Plaintiffs,

HON. PAUL L. MALONEY

v

**FIRST AMENDED
COMPLAINT**

LEE MUELLER; BOYCE MICHIGAN, LLC;
EDENVILLE HYDRO PROPERTY, LLC;
BOYCE HYDRO POWER LLC; BOYCE
HYDRO, LLC; WD BOYCE TRUST 2350; WD
BOYCE TRUST 3649; WD BOYCE TRUST
3650,

Defendants.

_____

Nathan A. Gambill (P75506)
Assistant Attorney General
Attorney for Plaintiffs
Michigan Department of Attorney General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
GambillN@michigan.gov

Anthony J. Kochis (P72020)
Attorney for Liquidating Trustee
Wolfson Bolton PLLC
3150 Livernois, Ste. 275
Troy, MI 48083
(248) 247-7105
akochis@wolfsonbolton.com

Lawrence A. Kogan (NY2172955)
Attorney for Lee W. Mueller
The Kogan Law Group
100 United Nations Plaza, Ste #14F
New York, NY 10017
(212) 644-9240
lkogan@koganlawgroup.com

Litigation is currently pending between the parties that is also related to Defendants'
misuse of the Edenville Dam.  Prior to the dam's failure, Plaintiffs filed an action in the
Ingham County Circuit Court, Case No. 20-255-CE, arising out of Defendants'
past, pre-dam-failure use of the dam.

## FIRST AMENDED COMPLAINT

The above-named Plaintiffs, by their attorneys, Dana Nessel, Attorney

General of the State of Michigan, and Nathan A. Gambill and Danielle Allison-

Yokom, Assistant Attorneys General, state as follows:

## INTRODUCTION

1.      This lawsuit is about Defendants' mismanagement of the Edenville

Dam and their indifference to public safety.  Defendants refused to adequately

repair and maintain their dam despite knowing for many years of repairs and

maintenance that needed to be done.  Ultimately, Defendants' dam failed on May

19, 2020, resulting in one of the worst flooding disasters in Michigan history.

Shortly after the dam failed, Defendants made the remarkable and public

admission that they had believed the dam would potentially fail in the spring if

Wixom Lake—which the dam impounded—was maintained at its traditional non-

winter level.  Yet, shockingly, Defendants had never shared that belief with

Plaintiffs or—as far as Plaintiffs know—with anyone else.

2.      Much has changed since the original complaint in this lawsuit was

filed.  Facing many lawsuits related to the failure of the Edenville Dam, two of the

Defendants (Boyce Hydro LLC and Boyce Hydro Power LLC) filed bankruptcy

petitions in the U.S. Bankruptcy Court for the Eastern District of Michigan on July

31, 2020.  The petitions were filed at Mr. Mueller's sole discretion and with his sole

approval.

3.      On December 23, 2020, a consent judgment was entered in condemnation proceedings filed by local governments to condemn the Edenville Dam, and Defendants transferred ownership of the Edenville Dam to the local governments.

4.      In the bankruptcy proceedings, the bankruptcy court ultimately confirmed a plan of liquidation and the plan went into effect on March 3, 2021.

5.      These events—Defendants' sale of the dam, and the confirmation of a bankruptcy plan—occurred after the original complaint in this suit was filed.  This first amended complaint is intended primarily to clarify how those events affect the relief Plaintiffs seek, and to specify the type of relief they seek against each Defendant.

## PARTIES, VENUE, AND JURISDICTION

6.      The Michigan Department of Environment, Great Lakes, and Energy (EGLE) is the agency tasked with enforcing Michigan's environmental laws, including Part 31, Part 301, Part 303, and Part 315 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.30101 et seq., MCL 324. 30301 et seq., and MCL 324.30315 et seq.

7.      The Michigan Department of Natural Resources (DNR) is the agency that manages the fish and wildlife in Michigan, which by law belong to the public. MCL 324.40105; MCL 324.48702(1).

8.      Edenville Hydro Property, LLC owned the Edenville dam.

3

9.     Boyce Michigan, LLC owned property on which the dam's operation depends.

10.     Boyce Hydro, LLC operated the Edenville dam.

11.     Boyce Hydro Power, LLC operated and funded the Edenville dam and formerly held a licensed issued by the Federal Energy Regulatory Commission (FERC).

12.     WD Boyce Trust 2350, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

13.     WD Boyce Trust 3649, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

14.     WD Boyce Trust 3650, is a member of Edenville Hydro Property, LLC; a member of Boyce Michigan, LLC; a member of Boyce Hydro, LLC; and a member of Boyce Hydro Power, LLC.

15.     Edenville Hydro Property, LLC, Boyce Michigan, LLC, Boyce Hydro, LLC, Boyce Hydro Power, LLC, WD Boyce Trust 2350, WD Boyce Trust 3649, and WD Boyce Trust 3650 are the Entity Defendants.

16.     Lee W. Mueller is sued personally and as member and co-manager of Edenville Hydro Property, LLC; as member and co-manager of Boyce Michigan, LLC; as member, employee, and co-manager of Boyce Hydro, LLC; as member and co-manager of Boyce Hydro Power, LLC; as co-trustee and beneficiary of WD Boyce

Trust 2350; as co-trustee and beneficiary of WD Boyce 3649; and as co-trustee and beneficiary of WD Boyce Trust 3650.  Mr. Mueller entirely controlled the dam and solely and completely controlled each of the trusts and LLC entities named as Defendants.

17.    Lee Mueller exercised unilateral control over the Entity Defendants. Without the need for any approval other than from himself, he could personally control their formation, operation, property, finances, and employees.  The Entity Defendants acted only with his approval and could not act without it.  Mr. Mueller used the entities as his alter-ego, as if their assets were his personal assets, and he used them—at his discretion—to pay personal debts.  Upon information and belief, Mr. Mueller disregarded corporate formalities and did not treat the Entity Defendants as separate from his personal ambitions, endeavors, or finances.  Upon information and belief, at Mr. Mueller's sole discretion, assets from the Entity Defendants have been used to fund the legal representation of the Individual Defendants in the individuals' private capacities.

18.    Mr. Mueller made the decision not to perform repairs and maintenance and otherwise failed to ensure the safety of the dam.  He used the Entity Defendants to carry out his decisions.  Among the consequences of those decisions are the violations alleged in this first amended complaint and the damages experienced by the State and the public as a result of the Edenville Dam's failure.

19.    The Edenville Dam is not within the jurisdiction of the United States Army Corps of Engineers granted by Section 10 of the federal Rivers and Harbors

Act, 33 USC 403.  That jurisdiction only extends up the Tittabawassee River from Lake Huron to approximately the City of Midland, and the Edenville Dam is more than 10 miles north of Midland.

20.    Venue is appropriate in this Court, and this Court has jurisdiction, because this action is "brought by the attorney general in the name of the state or of the people of the state, for the use and benefit thereof," so it is "as though the cause of action arose in" Ingham County.  MCL 14.102; see also MCL 600.1631.

## GENERAL ALLEGATIONS

21.    This disaster was the result of mismanagement and knowing, willful disregard for public safety on the part of Defendants.  As set forth below, Defendants knew of repairs that needed to be made to the Edenville Dam.  But Defendants chose to put profits ahead of safety—all while pocketing the money they earned using Michigan's public waterways.  Defendants' malfeasance culminated in the catastrophic failures of the Edenville and Sanford Dams on May 19, 2020. Shockingly, Defendants admitted after the failures that they had believed they should have used the Edenville Dam to permanently lower Wixom Lake year-round. Yet, they never acted on that belief or even revealed it to Plaintiffs.  Instead, they continued to use Edenville Dam for approximately 14 years to enrich themselves until FERC finally revoked their hydroelectric license because of Defendants' malfeasance.

22.    Michigan's Constitution declares the "conservation and development of the natural resources of the state" to be "of paramount public concern in the interest

6

of the health, safety and general welfare of the people."  1963 Const, art 4, § 52.

Accordingly, it orders the Legislature to "provide for the protection of the air, water

and other natural resources of the state from pollution, impairment and

destruction." *Id*.

23.     Because these resources belong to the public, when persons use the

resources to earn money, they owe a duty to the public to serve the public's interest.

Here, Defendants earned money from exploiting the power of the public's

waterways, so they had a duty to protect the public safety and to not destroy the

public's natural resources.

24.     To carry out its constitutional mandate, the Legislature created the

Natural Resources and Environmental Protection Act, MCL 324.101 et seq.

Defendants' actions implicate several provisions of that Act, including at the very

least Part 17 (Environmental Protection Act), Part 31 (Water Resources Protection),

Part 301 (Inland Lakes and Streams), Part 315 (Dam Safety), Part 401 (Wildlife

Conservation), and Part 487 (Sport Fishing).

**Wixom Lake and the Edenville Dam**

25.     Wixom Lake was an artificial impoundment formed by the Edenville

Dam at the confluence of the Tobacco and Tittabawassee Rivers.  It was one of four

impoundments created by four dams.  The other three dams are the Smallwood,

Secord, and Sanford Dams.

26.    The Edenville Dam spanned the Tittabawassee and Tobacco rivers and consisted of earthen embankments, totaling about 6,600 feet in length and having a maximum height of 54.5 feet.  It created Wixom Lake, a 2,600-acre reservoir.

27.    The Edenville Dam was owned, controlled, or operated by Defendants. Boyce Hydro Power held a license issued by FERC that authorized the generation of electricity for profit until September 25, 2018 when FERC revoked the license.

28.    Because the Edenville Dam, like the other dams owned and operated by Defendants, was a licensed hydroelectric generating facility, its safety was regulated entirely by FERC.  The State of Michigan had no regulatory authority over the safety of the dam while the license was in effect.

29.    This first amended complaint seeks relief against Defendants not because of their past malfeasance when the Edenville Dam was regulated by FERC, but because of their actions while the dam has been regulated by EGLE.  The only reason Defendants' history with FERC is relevant here is because it was FERC that informed Defendants in many instances of the repairs or upgrades needed at the Edenville Dam (albeit primarily in confidential documentation not available to EGLE).  Plaintiffs sue Defendants not because they did not ensure the safety of their dam while it was regulated by FERC, but because they did not ensure the safety of their dam while it was regulated by EGLE.

30.    Over the years, Defendants have made conflicting and misleading statements about the condition of the Edenville Dam, its ability to safely maintain the ordinary level of Wixom Lake during the non-winter months, and the utility of

preemptively lowering the level of Wixom Lake to decrease the chance of failure. The most plausible explanation for why Defendants made a particular statement at any given time is whether Defendants perceived the statement to be in their immediate financial self-interest.

31.     Because of the Edenville Dam's design, the dam would continue to hold back an enormous amount of water and form a lake even if the dam's spillway gates were fully open—it was not possible to fully draw down Wixom Lake, it was only possible to draw it down approximately seven feet.  For decades, only in the winter months, Wixom Lake was drawn down about three feet temporarily before it was returned to its traditional level in the non-winter months.

32.     Defendants took different positions at different times on whether dropping the level of Wixom Lake as low as the Edenville Dam would allow during the non-winter months was in the best interest of the public.  Sometimes Defendants' position was "yes," and sometimes it was "no," depending on what Defendants considered to be in their immediate financial self-interest.

**Defendants did not perform necessary maintenance on the dam.**

33.     As far back as 2004, FERC notified Defendants that the spillway capacity of their dam did not satisfy the federal requirement that the capacity be sufficient to pass a Probable Maximum Flood.  FERC ordered Defendants to bring their dam into compliance with federal standards.  The spillway is the structure designed to convey upstream river flows through the dam to the downstream

channel.  Spillway capacity is how much flow a dam can pass through the designated spillway before water flows over the top of the dam, or "overtop."

34.     In the meantime, in 2013, FERC also ordered Defendants to determine whether dropping the level of Wixom Lake approximately seven feet—as low as the Edenville Dam would allow—would be an effective way to protect the public while Defendants worked to increase the dam's spillway capacity.  Dropping the level of Wixom Lake seven feet would have prevented Defendants from generating electricity to sell, so it was in Defendants' immediate financial self-interest not to drop Wixom Lake seven feet at that time.  Defendants hired a consultant to perform the analysis requested by FERC, and the analysis concluded that dropping the level of Wixom Lake as low as the Edenville Dam would allow would *not* be an effective way to protect the public.  According to Defendants, the dam would still hold back so much water, that lowering Wixom Lake approximately seven feet would only create enough storage capacity behind the dam to delay overtopping of the dam by about one hour.  So, Defendants recommended *against* lowering Wixom Lake as low as the Edenville Dam would allow.  FERC accepted the recommendation.

35.     Ultimately, Defendants did not take FERC's notifications or orders regarding the Edenville Dam's spillway capacity seriously.  They balked at the cost of increasing their dam's spillway capacity.  They believed that a Probable Maximum Flood only occurs once every 1,000,000 years, so increasing the spillway capacity was not worth the expense.

36.     Nevertheless, Defendants made token efforts toward increasing the dam's spillway capacity to placate FERC and prolong the amount of time Defendants could use the Edenville Dam to generate revenue using Michigan's natural resources.  Since FERC had agreed with Defendants' recommendation that permanently lowering the level of Wixom Lake approximately seven feet would not significantly reduce the danger posed by the dam's limited spillway capacity, Defendants could continue to generate revenue and personally enrich themselves for as long as FERC would allow Defendants to operate a dam that did not satisfy federal spillway capacity requirements.

37.     In 2017 Defendants finally began work on increasing the dam's spillway capacity.  But when FERC issued another order proposing the revocation of Boyce Hydro Power's license in February 2018, Defendants *stopped the work on increasing the spillway capacity*.  Defendants believed that if the dam could not earn them money, they had no reason to increase its spillway capacity.  It was not about public safety for Defendants, it was about money.

38.     But the Edenville Dam's spillway capacity was not the only thing about the dam that concerned FERC.  They were also concerned about the stability of the dam's embankment—which is the earthen structure that holds back the water.

39.     FERC considered three of the four sections of the embankment to be in "poor" condition.  That is, they determined that the sections "may not fulfill [their]

intended function; maintenance or repairs are necessary," and made several recommendations to increase the reliability of the embankments.

40.     Defendants did not perform all the maintenance or repairs recommended by FERC.

41.     Indeed, FERC determined in 2018 that Defendants had not acted on 18 of Defendant's own engineers' recommendations regarding the Edenville Dam.  The recommendations had been outstanding for more than two years and Defendants had no apparent plan to act on them.  Among the recommendations Defendants ignored were recommendations related to the embankments, including the recommendations to increase the embankment's height, further stabilize portions of the embankment, and update the equipment used to determine if water was seeping through the embankment.

**FERC revoked Defendants' hydroelectric license because of their malfeasance.**

42.     FERC finally gave up on Defendants after Defendants had spent 14 years submitting incomplete plans, ignoring FERC's dam safety recommendations, and repeatedly making misleading statements.  FERC revoked Defendants' hydroelectric license effective September 25, 2018, noting the many years during which Defendants used "obfuscation" to mislead the agency, and expressed shock at Defendants' "appalling" indifference to public safety.  FERC did not, however, order Defendants to remove the dam.

43.     When FERC revoked Defendants' license to generate hydroelectricity, regulatory authority over the dam suddenly transferred to EGLE.  Because EGLE had no regulatory authority over the safety of Edenville Dam while it was under FERC jurisdiction and much of the information related to the Dam was classified as federal Critical Energy Infrastructure Information, EGLE had limited knowledge of FERC's concerns related to the Dam's during FERC's jurisdiction over the Dam.

44.     It took a significant amount of time for EGLE staff to obtain information about the Edenville Dam from FERC even after EGLE became the government entity with jurisdiction over the dam.  Defendants shared a limited amount of information, but EGLE staff had to submit Freedom of Information Act requests to FERC staff to obtain additional information designated as Critical Energy Infrastructure Information, which included most inspection reports about the Edenville Dam.  EGLE staff had to sign non-disclosure agreements with FERC that severely limited EGLE's use of the documents provided by FERC.

45.     Defendants, on the other hand, including Lee Mueller, were intimately familiar with the FERC documents, the condition of the Edenville Dam, and of the danger it apparently posed.

46.     Shortly after their dam failed in May 2020, Defendants made the shocking announcement that they had believed that *permanently* lowering Wixom Lake by about seven feet year-round—the lowest the Edenville Dam would allow— was necessary to protect the public.  But Defendants never did so.  This was a

significant development, because it contradicts not only what they told FERC in 2013 (see paragraph 34), but it contradicts what Defendants told Plaintiffs.

47.     Defendants claimed they shared their belief with Plaintiffs and Plaintiffs somehow compelled Defendants to maintain the ordinary level of Wixom Lake in the non-winter months despite Defendants' concerns.  That is false. Defendants kept their belief a secret until *after* the dam failed.  As more fully alleged below, apparently the reason Defendants kept their belief a secret until after their dam failed is because Defendants believed keeping the secret was in their immediate financial self-interest.

48.     Within weeks of FERC revoking Defendants' license, EGLE staff performed a visual inspection of the Edenville Dam on October 4, 2018 to determine if any visible structural deficiencies would be expected to cause immediate failure. Defendants did not share with EGLE their apparently secret belief that Wixom Lake should have been *permanently* lowered year-round approximately seven feet— as low as the dam would allow—in the interest of public safety.

49.     EGLE's October 4, 2018 inspection was just a first step in EGLE's ongoing effort to understand the Edenville Dam's condition, and EGLE continued to request information about the dam's condition from Defendants.

**Defendants put profits over people in their attempt to sell the dam to local governments.**

50.     Without a FERC license, Defendants could no longer generate revenue from the Edenville Dam, so they implemented a strategy to both minimize expenses and maximize the likelihood that someone would buy the dam from them.

51.     Their effort to minimize expenses included a refusal to invest in the type of ice-fighting methods other non-hydroelectric dams in Michigan used. Instead, rather than temporarily dropping the level of Wixom Lake approximately *three* feet during the winter months—as had been done for decades—Defendants wanted to temporarily lower the lake *seven* feet—as much as the dam would allow. Defendants never intended to permanently lower Wixom Lake seven feet.  They just did not want to invest in ice-fighting methods.

52.     Defendants temporarily lowered Wixom Lake approximately seven feet during the winter of 2018, which exposed much more bottomland than residents on the lake were accustomed to seeing.

53.     By exposing so much bottomland, Defendants' winter 2018 drawdown also served the other prong of Defendants' strategy:  maximize the likelihood that someone would buy the dam from them.  The thousands of people with homes on Wixom Lake, and their local governments, were extremely concerned by Defendants' behavior.  As Defendants likely hoped they would, in October 2018, both Midland and Gladwin Counties approved resolutions to seek a court order that would not only require Defendants to maintain a consistent lake level during both the winter and non-winter months but authorized the Counties to start the process

15

of purchasing the Edenville Dam to protect their residents from Defendants. The Counties delegated authority to the Four Lakes Task Force to lead the effort.

54. Apparently, Defendants feared that if the local residents and governments knew about Defendants' belief that Wixom Lake should be *permanently* lowered seven feet year-round—including during the summer months—those residents and governments would not buy their dam or would pay much less money for it than Defendants wanted. This is because maintaining Wixom Lake's ordinary summer level was a primary reason the residents and governments wanted to purchase the dam. So, Defendants apparently kept that belief a secret. They never shared that belief with Plaintiffs, and to Plaintiffs' knowledge, Defendants never shared that belief with the local residents or governments.

55. Defendants submitted an engineering analysis to EGLE on January 4, 2019 concluding that the dam's spillway capacity already satisfied Michigan's dam safety standards, so it did not need the expensive improvements that FERC had been required under federal standards. Nothing about the analysis suggested that the Wixom Lake should have been permanently lowered seven feet. EGLE continued to seek additional information about the dam's spillway capacity from Defendants.

56. On January 25, 2019, Midland and Gladwin Counties and the Four Lakes Task Force filed a petition in circuit court seeking an order that would 1) prohibit Defendants from lowering Wixom Lake more than the typical three feet

during the winter months, 2) maintain the nearly century-old traditional level of the lake during the non-winter months, and 3) establish a special assessment district to pay for the purchase and maintenance of the Edenville Dam (Proposal).

57.    On February 19, 2019, the Four Lakes Task Force hosted a public meeting regarding Wixom Lake to discuss the Proposal.  Neither Mr. Mueller nor any other Defendant appeared at the meeting, nor did they otherwise express any concern about the Proposal or share their belief that Wixom Lake should be permanently lowered year-round by approximately seven feet—as much as the Edenville Dam would allow.

58.    On February 20, 2019, the Four Lakes Task Force hosted another public meeting on the same topic.  Neither Mr. Mueller nor any other Defendant appeared at the meeting, nor did they otherwise express any concern about the Proposal or share their belief that Wixom Lake should be permanently lowered year-round by approximately seven feet—as much as the Edenville Dam would allow.

59.    The Four Lakes Task Force set up an email address to receive public comments on the Proposal.  Neither Mr. Mueller nor any other Defendant submitted an email expressing any concern about the Proposal or share their belief that Wixom Lake should be permanently lowered year-round by approximately seven feet—as much as the Edenville Dam would allow.

60.    The Four Lakes Task Force set up a telephone hotline to receive public comments on the Proposal.  Neither Mr. Mueller nor any other Defendant called the

hotline to express any concern about the Proposal or share their belief that Wixom

Lake should be permanently lowered year-round by approximately seven feet—as

much as the Edenville Dam would allow.

61.     The Four Lakes Task Force set up a Facebook page to receive public

comments on the Proposal.  Neither Mr. Mueller nor any other Defendant

submitted any comments to the Facebook page to express any concern about the

Proposal or share their belief that Wixom Lake should be permanently lowered

year-round by approximately seven feet—as much as the Edenville Dam would

allow.

62.     The Four Lakes Task Force had a physical address and accepted

letters commenting on or objecting to the Proposal.  Neither Mr. Mueller nor any

other Defendant submitted a letter to express any concern about the Proposal or

share their belief that Wixom Lake should be permanently lowered year-round by

approximately seven feet—as much as the Edenville Dam would allow.

63.     In approximately April 2019, Defendants voluntarily returned Wixom

Lake to its ordinary non-winter level.  No government ordered such a result,

Defendants did so voluntarily.  Defendants did so notwithstanding their apparently

secret belief that maintaining the ordinary level of Wixom Lake in the non-winter

months was too dangerous and posed a risk to downstream residents and their

property.

64.     On May 3, 2019, the circuit court held a public hearing on the

Proposal.  Neither Mr. Mueller nor any other Defendants appeared at all, let alone

18

to express any concern about the Proposal or share their belief that Wixom Lake should be permanently lowered year-round by approximately seven feet—as much as the Edenville Dam would allow.  Nor did Defendants submit any written comments or objections to the circuit court of any kind.

65.    On May 28, 2019, the circuit court entered the order requested by the Counties and the Task Force, implementing the Proposal.

66.    The State of Michigan gave a $5,000,000 grant to Midland County to help it begin the process of acquiring the dam, establishing an assessment district, and making high priority concrete repairs (even though the counties did not yet own the dam).  Since—as FERC had determined based on Defendants' recommendation—permanently lowering Wixom Lake by approximately seven feet year-round would not alleviate the danger posed by the dam's spillway capacity, the Counties, Task Force, and state agencies, believed the only way to alleviate the danger posed by the Edenville Dam was to promptly make the repairs and maintenance Defendants had neglected.

67.    As shown by FERC's inability to force Defendants to bring the Edenville Dam into compliance with regulations, enforcing dam safety laws against unwilling private dam owners can take many years.  In the past, it has taken as long as a decade for EGLE to force an unwilling dam owner to repair or remove a dam by filing an enforcement action—and that is even when the taxpayers fund the repair or removal.

68.     But thanks to the initiative of the local communities and funding from the State, the process a court might have ultimately ordered Defendants to undertake only after years of litigation had EGLE filed a dam safety enforcement action against Defendants—sell the Edenville Dam so it could be repaired and managed by competent people—was already well underway and moving at a much quicker rate than if EGLE were acting alone.

69.     On September 18, 2019, the Spicer Group, on behalf of the Task Force, submitted a memo to EGLE that disagreed with Defendants' January 4, 2019 conclusion that the Edenville Dam's spillway capacity satisfied Michigan's requirements. The Spicer Group then outlined the Task Force's plan to develop a comprehensive repair plan that would provide adequate spillway capacity for the dam and complete repairs by 2024. The Task Force also had a plan to complete many other repairs needed at the dam. Nothing in the memo suggested that Wixom Lake should have been permanently lowered by seven feet year-round.

70.     Meanwhile, Defendants continued to look for opportunities to lower expenses at the Edenville Dam—especially since they were negotiating the sale of the dam to the Counties and Task Force. Defendants still had not invested in the type of ice-fighting methods other non-hydroelectric dams in Michigan use. Instead, Defendants wanted to again perform a seven-foot winter drawdown, more than the three feet permitted by the circuit court's order.

71.     Defendants did not communicate their apparent belief to Plaintiffs that Wixom Lake needed to be *permanently* lowered by seven feet. Instead,

Defendants' September 25, 2019 permit application to EGLE explained that Defendants planned to return Wixom Lake to its ordinary non-winter level in approximately April 2020.  Defendants' September 2019 request to temporarily lower Wixom Lake by approximately seven feet had nothing to do with the level of Wixom Lake in the non-winter months.

72.     EGLE denied Defendants' permit application because Defendants' desire to save money over the winter did not justify the natural resource damage a seven temporary winter drawdown would cause.  Defendants performed the Drawdown, anyway, rather than investing money into fighting ice over the winter the same way other non-hydroelectric dam owners do.

73.     Once EGLE learned of the December 2019 drawdown, it sent notice to Defendants of the violation to give them an opportunity to mitigate the natural resource damages Defendants were causing.  Defendants did not mitigate the damages and continued the December 2019 Drawdown.

74.     Defendants met with staff from Plaintiffs in February 2020 to discuss the winter operation of the Edenville Dam.  Defendants expressed no concern at all about the non-winter level of Wixom Lake and certainly did not express their apparently secret belief that the lake needed to be permanently lowered year-round.

75.     Before returning Wixom Lake to its ordinary level in April 2020 as they had always planned to do, Defendants submitted an application to EGLE to obtain a permit.  Defendants' application was part of the plan Defendants had all along to return Wixom Lake to its traditional non-winter level in April 2020 and it

did not communicate any concerns about doing so.  EGLE granted the permit application.

76.     Once April 2020 arrived, Defendants promptly—and voluntarily—returned Wixom Lake to its ordinary non-winter level.  It was not until April 30, 2020—after Defendants had already returned Wixom Lake to its normal level—that Plaintiffs filed a lawsuit against Defendants to determine the extent of the damage Defendants' two unauthorized temporary winter drawdowns had caused and collect natural resource damages for those past actions.  The lawsuit did not seek a preliminary injunction or otherwise attempt to compel Defendants to return Wixom Lake to its ordinary level.  Indeed, relief of that nature would not have made sense because Defendants had already, and voluntarily, returned Wixom Lake to its ordinary non-winter level just as they had always planned to do.

77.     On May 19, 2020, Defendants' dam failed.  The way the dam failed suggests that the dam's spillway capacity may not have been the primary cause. The dam's spillways had the capacity to pass up to approximately 22,000 cubic feet per second.  The spillways were still passing enough water to prevent water from overtopping the dam.  Indeed, the Tittabawassee River was running at approximately 20,000 cubic feet per second at the time of the failure—less than the 21,600 cubic feet per second present in 1945 during the most severe flood of record up to that point.  Water did not overtop the Edenville Dam.  Instead, it appeared that the dam failed because its embankment gave way.

78.    FERC had long observed (albeit in confidential reports) that the embankments were constructed of loose fill that had a tendency to erode easily. And Defendants' own engineer had been surprised to learn the embankments had been constructed using a dump fill technique rather than a compacting technique, and marveled that the embankments had been relatively stable for over 90 years. Defendants knew that the embankments on their dam required special attention and had not taken the necessary steps to ensure their ongoing stability and reliability.

79.    Once Defendants' dam failed, they knew that many people would make legal claims against them, so apparently Defendants no longer considered it to be in their immediate financial self-interest to keep their belief a secret.  Defendants, for the first time, divulged their secret belief that Wixom Lake should have been *permanently* lowered approximately seven feet—the most the Edenville Dam would allow—in the interest of public safety.  But Defendants also claimed that they had previously shared their belief with Plaintiffs, and Plaintiffs had somehow forced Defendants to put downstream residents in danger.  That is false.

80.    Defendants never divulged their secret belief to Plaintiffs.  Defendants have never produced any documentation to substantiate their claim that they shared their belief with Plaintiffs or that Plaintiffs tried to force Defendants to raise the non-winter level of Wixom Lake over supposed dam-safety objections raised by Defendants.  All existing documentation, as explained in this first amended complaint, shows that Defendants always planned to return Wixom Lake to its

23

traditional non-winter level in April 2020; that they did so; and that they never expressed any concern about doing so.

81.     Nor is it clear, as Defendants suggest, that simply lowering Wixom Lake approximately seven feet would have prevented the May 19, 2020 tragedy considering Defendants' own 2013 analysis, the amount of water the dam would continue to impound, and the condition of the dam's embankment.  Yet Defendants made the statements, anyway, presumably because they considered them to be in their immediate financial self-interest as part of an effort to deflect blame away from themselves and onto others.

82.     Defendants' statements are even more incriminating when it is recognized that Defendants had the authority under MCL 324.31512 to immediately lower Wixom Lake at any time if they thought it would fend off an imminent failure of the dam.  If Defendants apparently thought the failure of the dam was imminent and lowering Wixom Lake approximately seven feet would have staved off failure, Defendants could have and should have lowered Wixom Lake in the non-winter months.  But apparently Defendants did not do so because it was not in their immediate financial self-interest to do so since they were trying to sell their dam to the local governments.

83.     The surge of water resulting from the failure caused hundreds of thousands of gallons of water per second to flow downstream, causing the failure of the Sanford Dam downstream, effectively destroying the Village of Sanford, and flooding hundreds of homes and other buildings.

24

84.     The deluge also washed large amounts of potentially contaminated sediments, debris, garbage, and other harmful substances into the waters of the State, regulated bottomlands, regulated floodplains, and possibly into regulated wetlands.

85.     By information and belief, the deluge also killed fish and other animals owned by the State.

86.     If Defendants had completed all the necessary maintenance to their dam and properly operated the dam, it is reasonable to conclude that the dam's failure would not have occurred.

87.     The complete human and environmental toll caused by Defendants' malfeasance remains to be fully realized and quantified, but there is no doubt it is devastatingly high.

88.     The deluge caused by Defendants' malfeasance has devasted lands and homes—including resources the State holds in trust for the public—and will reverberate into the future as the people who had relied on Defendants put their lives back together.

89.     Defendants must be held accountable for using the public's natural resources to earn millions of dollars but violating the duty to the public that their use of those resources created.  Their violation of that duty has caused massive injury to the State's people, land, natural resources, and economy, including the public resources the State holds in public trust.

90.     Defendants' actions have caused Wixom Lake and its associated wetlands to cease to exist—they are effectively drained.  The lake and wetlands have been replaced by enormous mud flats.

91.     The path of destruction and debris downstream from Wixom Lake, including impacts caused by the failure of the Sanford Dam, also creates a public nuisance affecting thousands of people.

92.     Like Wixom Lake, the failure of the Sanford Dam caused Sanford Lake—and any wetlands reliant on it—to effectively drain, leaving a mud pit in its place, surrounded by useless docks.

93.     The public in general, the local governments affected by the flood, and the people who have built their lives and business around Wixom Lake and Sanford Lake and their associated wetlands for nearly 100 years have a right to know how the tragedy occurred and deserve a judgment adjudicating the impact Defendants' actions had on the State's natural resources.

94.     Plaintiffs seek civil fines and money damages from Mr. Mueller, but not Entity Defendants.

95.     Plaintiffs are authorized by law to seek declaratory relief in addition to civil fines and damages.

96.     Defendants do not believe they are responsible for the failure of their dam or for the significant injury to the State's natural resources caused by the failure.  Plaintiffs plainly allege to the contrary.  This dispute constitutes an actual controversy.  Plaintiffs are entitled both by statute, MCL 324.1701(1), and court

rule, MCR 2.605, to seek a declaratory judgment from this Court to resolve the dispute.

### COUNT I: PART 17 (ENVIRONMENTAL PROTECTION ACT)

97.     All previous allegations are incorporated here.

98.     As explained above, Defendants owned, operated, or controlled the dam that failed, and the failure caused massive injuries to the State's waterways and other natural resources, including the public trust in those resources. Defendants are responsible for the dam's failure, and the failure was a violation of the Natural Resources and Environmental Protection Act.

99.     Plaintiffs seek a declaratory judgment under the Michigan Environmental Protection Act, MCL 324.1701 et seq, against Defendants that declares Defendants' actions unlawful; declares that the actions impaired or destroyed Michigan's natural resources and the public trust in those resources; and that adjudicates the impact that Defendants' conduct had on those natural resources and the public trust in those resources.

100.    Plaintiffs also seek an order under MCL 324.1704(1)—against Mr. Mueller only—that requires him to repair the damage his actions caused the State's natural resources.

### COUNT II: PART 31 (WATER RESOURCES PROTECTION)

101.    All previous allegations are incorporated here.

102.   As explained above, Defendants' malfeasance caused the discharge of potentially contaminated sediments and other substances harmful to the public health and safety into the waters of the state, and the deposit of unauthorized material onto floodplains.  Those discharges and deposits were in violation of MCL 324.3108 and MCL 324.3109.

103.   Plaintiffs seek a declaratory judgment against all Defendants finding that Defendants' conduct was a violation of Part 31.

104.   Plaintiffs also seek an order under MCL 324.3115—against Mr. Mueller only—requiring him to clean up the discharges his actions caused, pay civil fines, and pay attorneys' fees and costs.

## COUNT III: PART 301 (INLAND LAKES AND STREAMS)

105.   All previous allegations are incorporated here.

106.   Wixom Lake is an "inland lake or stream" under MCL 324.30101(i).

107.   Defendants' actions "diminish[ed] an inland lake or stream" in violation of MCL 324.30102(1)(d) and deposited unauthorized material on bottomlands in violation of MCL 324.30102(a).

108.   Defendants' malfeasance and mismanagement has decimated the ecosystems of Wixom Lake and Sanford Lake, created mud pits where lakes used to be, and caused the deposit of large amount of unauthorized material on bottomlands.

109.   Plaintiffs seek a declaratory judgment against all Defendants finding that Defendants' conduct was a violation of Part 301.

110.    Plaintiffs also seek an order under MCL 324.30112—against Mr.

Mueller only—requiring him to pay civil fines, restore the Sanford Lake and Wixom

Lake ecosystems to their prior conditions to the extent possible under the

circumstances, and clean up the unauthorized material on bottomlands.

## COUNT IV: PART 303 (WETLANDS PROTECTION)

111.    All previous allegations are incorporated here.

112.    There were previously wetlands reliant on Wixom Lake, and by

information and belief Sanford Lake, and the drainage of those wetlands without a

permit has been caused by the malfeasance of Defendants in violation of

MCL 324.30304(d).

113.    By information and belief, the deluge resulting from Defendants'

malfeasance also caused the unauthorized deposit of fill materials into wetlands

downstream of Edenville and Sanford Dams, in violation of MCL 324.30304(a).

114.    Plaintiffs seek a declaratory judgment against all Defendants finding

that Defendants' conduct was a violation of Part 303.

115.    Plaintiffs also seek an order under MCL 324.30316—against Mr.

Mueller only—requiring him to restore the affected wetlands as much as possible

under the circumstances and pay civil fines.

## COUNT V: PART 315 (DAM SAFETY)

116.    All previous allegations are incorporated here.

117.    A person shall not alter or abandon a dam except in accordance with Part 315, Dam Safety of the NREPA.  MCL 324.31507(1).

118.    By mismanaging the Edenville Dam to the point that it failed, which also caused the Sanford Dam to fail, Defendants altered dams in a manner not provided for by law.

119.    Plaintiffs seek a declaratory judgment against all Defendants finding that Defendants' conduct was a violation of Part 315.

### COUNT VI: CONVERSION (AGAINST MR. MUELLER ONLY)

120.    All previous allegations are incorporated here.

121.    The State owns the fish, wildlife, and freshwater mussels whose deaths were caused by Mr. Mueller's malfeasance.  MCL 324.48702(1); MCL 324.40105.

123.    Mr. Mueller had a duty not to interfere with the State's property, let alone destroy it.

124.    Mr. Mueller knew or should have known that his actions would cause a deluge of water to surge downriver killing fish and wildlife and exposing large portions of the bottomland of Wixom Lake and Sanford Lake, killing aquatic life.

125.    Mr. Mueller's actions wrongfully exerted dominion over the fish, wildlife, and aquatic life and caused their death, which denies and is inconsistent with the State's rights to them.

126.    Mr. Mueller's actions constitute a taking, and it was contrary to law for Mr. Mueller to take the State's fish, wildlife, and aquatic life without authorization.  MCL 324.48702(1); MCL 324.40105.

127.    Plaintiffs seek damages from Mr. Mueller for his conversion of the State's fish, wildlife, and aquatic life.

**COUNT VII: UNJUST ENRICHMENT (AGAINST MR. MUELLER ONLY)**

128.    All previous allegations are incorporated here.

129.    By common law and the principles of justice, a person may not be inequitably enriched by receiving a benefit at another's expense.

130.    The principles of unjust enrichment are violated where a party steps in to address a duty owed by another to the public to protect the public from an urgent threat to their health, safety, or general welfare and pays expenses that rightfully should have been paid by the other person.

131.    Mr. Mueller had a duty to protect the public, and his actions violated that duty, resulting in a disaster that has created ongoing harms to the public's health, safety, and welfare.

132.    To address the public harms Mr. Mueller caused, Plaintiffs have expended considerable public resources.

133.    Mr. Mueller received a benefit from the Plaintiffs because he has been temporarily relieved of his obligation to address the threat to public health, safety, and welfare that he was otherwise obligated to address.

134.   The principles of justice and established common law require Mr. Mueller to reimburse Plaintiffs for performing a duty to the public that was properly owed by Mr. Mueller.

## RELIEF REQUESTED

As explained above, Plaintiffs seek the following:

a.   A declaratory judgment finding that Defendants violated the Natural Resources and Environmental Protection Act and adjudicating the impact of Defendants' unlawful actions on Michigan's natural resources and the public trust in those resources;

b.   The orders described above against Mr. Mueller only;

c.   An injunction forbidding Defendants from violating the law in the future to the extent any Defendants continue to or plan to operate in Michigan;

d.   Civil fines and money damages, but only against Mr. Mueller, not the Entity Defendants;

e.   Any other relief the Court considers appropriate as long as any relief ordered against the Entity Defendants would not constitute a "claim" under the Bankruptcy Code.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ *Nathan A. Gambill*
Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General

32

                                        Attorneys for Plaintiffs
                                        Michigan Department of Attorney General
                                        Environment, Natural Resources, and
                                        Agriculture Division
                                        P.O. Box 30755
                                        Lansing, MI 48909
                                        (517) 335-7664
                                        gambilln@michigan.gov
                                        allisonyokomd@michigan.gov

Dated:  May 25, 2021


LF:  Dam-Mueller, Boyce Hydro (EGLE & DNR v)/AG# 2020-0291918-C-L/First Amended Complaint 2021-05-25