IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENT, GREAT LAKES, AND           No. 1:20-cv-528
ENERGY, AND THE MICHIGAN
DEPARTMENT OF NATURAL RESOURCES,        HON. PAUL L. MALONEY

      Plaintiffs,

v

LEE MUELLER; BOYCE MICHIGAN, LLC;
EDENVILLE HYDRO PROPERTY, LLC;
BOYCE HYDRO POWER LLC; BOYCE
HYDRO, LLC; WD BOYCE TRUST 2350; WD
BOYCE TRUST 3649; AND WD BOYCE
TRUST 3650,

      Defendants.

———————————————————

Nathan A. Gambill (P75506)                Anthony J. Kochis (P72020)
Danielle Allison-Yokom (P70950)           Kelsey Ann Postema (P85428)
Assistant Attorneys General               Attorneys for Liquidating Trustee
Attorneys for Plaintiffs                  Wolfson Bolton PLLC
Michigan Department of Attorney General   3150 Livernois, Ste. 275
Environment, Natural Resources, and       Troy, MI 48083
Agriculture Division                      (248) 247-7105
P.O. Box 30755                            akochis@wolfsonbolton.com
Lansing, MI 48909                         kpostema@wolfsonbolton.com
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

———————————————————————————————————————/

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Dana Nessel
Attorney General

Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
Attorneys for Plaintiffs
Michigan Department of Attorney
General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

Dated:  May 25, 2023

# TABLE OF CONTENTS

Page

Index of Authorities ...................................................................................................iii

Concise Statement of Issues Presented .................................................................. v

Controlling or Most Appropriate Authority ............................................................ vii

Introduction ............................................................................................................ 1

Statement of Facts ................................................................................................. 2

> Boyce Hydro recognized that the eastern end of the embankment was
> at risk of failure but did not address the problem. ........................................... 2

> Boyce Hydro spent significant time and money on projects unrelated to
> operating a hydroelectric dam. ....................................................................... 4

> The eastern end of the embankment that Boyce Hydro thought would
> fail did fail. .................................................................................................... 7

> Boyce Hydro could have prevented the failure of the east embankment
> of the Edenville Dam. ................................................................................... 10

Legal Standard ...................................................................................................... 13

Argument ............................................................................................................... 15

I.    Boyce Hydro is barred from relitigating issues resolved by a final
judgment in state court........................................................................................ 15

II.   Boyce Hydro is responsible for the failure of its dam, which resulted in
the violation of multiple environmental laws. .................................................. 17

> A.    Boyce Hydro violated Part 315 of NREPA (Dam Safety). .................... 17

> B.    Boyce Hydro violated Part 17 of NREPA (Environmental
> Protection). ......................................................................................... 19

> C.    Boyce Hydro violated Part 31 of NREPA (Water Resources). .............. 21

> D.    Boyce Hydro violated Part 301 of NREPA (Inland Lakes and
> Streams)................................................................................................ 22

Conclusion and Relief Requested .......................................................................... 23

Certificate of Compliance ............................................................................ 26

# INDEX OF AUTHORITIES

<div align="right">Page</div>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ................................................................ 14

*Jones v. UPS Ground Freight*,
 683 F.3d 1283 (11th Cir. 2012) ............................................... 14

*Keywell & Rosenfeld v. Bithell*,
 254 Mich. App. 300 N.W.2d 759, 782 (2002) ................................. vii, 16

*Knoblauch v. Kenyon*,
 163 Mich. App. 712 N.W.2d 286, 290 (1987) .......................... 16

*Lee v. Offshore Logistical & Transp., L.L.C.*,
 859 F.3d 353 (5th Cir. 2017), as revised (July 5, 2017) ......................... 14

*Lopez v. Union Carbide Corp.*,
 83 F. Supp. 2d 880 (E.D. Mich. 2000) ................................... vii, 15

*Moore v. Philip Morris Cos.*,
 8 F.3d 335 (6th Cir. 1993) ...................................................... 14

*Order Revoking License*,
 164 FERC ¶ 61,178 (September 10, 2018) ......................... 7, 12

*Surles v. Andison*,
 678 F.3d 452 (6th Cir. 2012) .................................................. 13

**Statutes**

28 U.S.C. § 2201(1) .................................................................. 23

Mich. Comp. Laws § 324.1701(1) ............................................ 19

Mich. Comp. Laws § 324.1703(1) ............................................ vii

Mich. Comp. Laws § 324.1704(3) ...................................... 19, 20

Mich. Comp. Laws § 324.30101(a) ........................................... 22

Mich. Comp. Laws § 324.30101(i) ............................................ 22

Mich. Comp. Laws § 324.30102(1) ............................................................... vii

Mich. Comp. Laws § 324.30102(1)(a) .......................................................... 22

Mich. Comp. Laws § 324.30102(1)(d) .......................................................... 22

Mich. Comp. Laws § 324.3108(1) ........................................................... vii, 21

Mich. Comp. Laws § 324.3109(1) ........................................................... vii, 21

Mich. Comp. Laws § 324.3115 ..................................................................... 21

Mich. Comp. Laws § 324.31501 ................................................................... 17

Mich. Comp. Laws § 324.31506(2)(a) .......................................................... 17

Mich. Comp. Laws § 324.31520(1) ..................................................... vii, 17, 19

Mich. Comp. Laws § 324.31524(2) .............................................................. 19

Mich. Comp. Laws 324.1703(1) ............................................................. 19, 20

## Rules

Fed. R. Civ. P. 54(b) ................................................................................. 24

Fed. R. Civ. P. 56(c)(1)(A) ....................................................................... 13

Fed. R. Civ. P. 56(a) ................................................................................. 13

Fed. R. Civ. P. 56(C)(1) ............................................................................ 13

Fed. R. Civ. P. 56(c)(2) ............................................................................ 14

## Treatises

10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.)............................................... 14

## CONCISE STATEMENT OF ISSUES PRESENTED

1.   The doctrine of collateral estoppel directs that a question put in issue and decided by a court of competent jurisdiction cannot be disputed in a subsequent action between the same parties.  A state court already issued a final judgment in litigation between the same parties regarding issues that are also present in this case.  Does the doctrine of collateral estoppel prevent Boyce Hydro[1] from attempting to relitigate issues in this Court that it already had a full and fair opportunity to litigate in state court?

2.   Part 315 of the Michigan Natural Resources and Environmental Protection Act (NREPA) required Boyce Hydro to notify the Michigan Department of Environment, Great Lakes, and Energy (EGLE) of any defects in the Edenville Dam that may affect its safety.  Boyce Hydro discovered a defect in 2010, but did not repair it, nor did it notify EGLE of the defect.  Did Boyce Hydro violate Part 315?

3.   Part 17 of NREPA barred Boyce Hydro from conduct that would pollute, impair, or destroy Michigan's water or other natural resources unless Boyce Hydro could show that there was no feasible and prudent alternative to its conduct and that its conduct was consistent with the public welfare.  Here, Boyce Hydro failed to repair a known defect of its dam, and the dam failed in exactly the way Boyce Hydro predicted it would.  It could have fixed the defect but chose instead to pursue expensive extracurricular activities unrelated to dam safety.  Did Boyce Hydro violate Part 17?

4.   Part 31 prohibited Boyce Hydro—without a permit—from filling floodplains or streams; harmfully interfering with the discharge characteristics of a stream; or discharging injurious substances into Michigan's waters.  The evidence in this case shows that the failure of Boyce Hydro's dam resulted in all three occurrences.  Did Boyce Hydro violate Part 31?

---

[1] "Boyce Hydro" refers to defendants Boyce Michigan, LLC, Boyce Hydro Power LLC, Boyce Hydro, LLC, WD Boyce Trust 2350, WD Boyce Trust 3649, and WD Boyce Trust 3650.

5.    Part 301 prohibited Boyce Hydro—without a permit—from diminishing an inland lake or depositing fill on bottomlands.  The evidence in this case shows that the failure of Boyce Hydro's dam resulted in both occurrences.  Did Boyce Hydro violate Part 301?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>Authority</u>:    *Lopez v. Union Carbide Corp.*, 83 F. Supp. 2d 880, 884 (E.D. Mich. 2000).

*Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 340, 657 N.W.2d 759, 782 (2002).

Mich. Comp. Laws § 324.31520(1).

Mich. Comp. Laws § 324.1703(1).

Mich. Comp. Laws § 324.3108(1).

Mich. Comp. Laws § 324.3109(1).

Mich. Comp. Laws § 324.30102(1).

# INTRODUCTION

The Edenville Dam was private property.  It was regulated by the Federal Energy Regulatory Commission (FERC) until FERC walked away in September 2018.  Boyce Hydro—which was controlled by Lee Mueller—owned the dam and is responsible for the May 19, 2020 failure of the dam's east embankment.  In emails that Mr. Mueller tried to keep secret, Boyce Hydro acknowledged that it knew by 2010 that the east embankment could fail if the water level behind it got too high.  But Boyce Hydro apparently never divulged that information to FERC, nor did it share that information with Michigan after September 2018 once the dam fell under state jurisdiction.  Boyce Hydro did not repair the defect in the dam.  It could have installed an upstream sheet pile cutoff wall on the east embankment; constructed a downstream buttress on the east embankment just as it did on other parts of the dam; or increased the dam's spillway capacity just as it promised federal regulators it would do.  Any of those things would likely have prevented the failure of the east embankment.  But Boyce Hydro did none of them.  Instead, Boyce Hydro spent its time and money on non-dam-safety related projects, such as attempting to hold a music festival, designing a marina and RV park, operating a sawmill, and trying to develop a residential neighborhood.  Its dam safety engineer finally resigned in protest in 2017 when he saw that Boyce Hydro was not willing to prioritize key dam safety issues.  Boyce Hydro's neglect of the east embankment of the dam led to the embankment's failure, which resulted in the tragic flooding of downstream properties and massive destruction of Michigan's natural resources.

## STATEMENT OF FACTS

**Boyce Hydro recognized that the eastern end of the embankment was at risk of failure but did not address the problem.**

Boyce Hydro took control of the Edenville Dam in 2006.  (Ex. A, Lee Mueller Tr, 10:16.)  From that time until the dam's eastern embankment failed in May 2020, Boyce Hydro was controlled by Lee Mueller, and Mr. Mueller was the person who acted for Boyce Hydro.  (First Amend. Compl., ¶¶ 16–18, PageID.2522–2523; Ex. B, 3/8/2023 State Court Judgment, ¶ 4; Ex. C, 3/3/2021 Bankruptcy Signature Page; Ex. D, 2/5/2020 Email Confirming Lee Mueller and Boyce Hydro Control; Ex. E, Letters from Lee Mueller designating Boyce Hydro's agents.)

Shortly before Boyce Hydro took control of the dam, its previous owner in 2004 had constructed overlays on the downstream side of two areas of the dam's embankment to strengthen the embankment.  (Ex. 1 to Ex. A Lee Mueller Tr, Dam Modifications; Ex. A, Lee Muller Tr., 27:8–28:6.)  And then Boyce Hydro, in 2007, performed an additional construction project on another area of the downstream side of the dam to further strengthen the dam's embankment.  (*Id*.)

In 2010, Boyce Hydro held a meeting which included Mr. Mueller, Frank Christie (Boyce Hydro's dam safety engineer), and a consultant named Steve Doret.  (Ex. 2 to Ex. A, Mueller Tr., 11/17/2021 Email.)  In the meeting, Mr. Mueller "expressed concern" that the east embankment of the dam was "far too narrow and the side slopes too steep," such that it was "not particularly conducive to withstanding the hydrostatic pressures of an elevated pond in the extreme flood conditions."  (*Id*.)  Mr. Christie and Mr. Doret "agreed" with Mr. Mueller.  (*Id*.)  To

address this concern, in October 2012, Mr. Mueller and Mr. Christie came up with plan to "install sheet piling from the very east end of the Edenville Dam all the way . . . to the existing concrete spillways" on the upstream side of the dam.  (Ex. A, Lee Mueller Tr., 24:24–25:19.)  The purpose was to, among other things, create "a cut off wall . . . for water flow."  (*Id*.)  The project would have been the first phase of a multi-phase project to also replace the concrete spillways on the dam.  (Ex. A, Lee Mueller Tr, 31:21–34:12; Ex. 3 to Ex. A Lee Mueller Tr, October 2012 Plan.)

Boyce Hydro did not carry out its October 2012 plan to install the upstream sheet pile cut off wall on the east embankment.  Mr. Mueller testified that even if Boyce Hydro did not carry out its full multi-phase construction plan to replace the concrete spillways, it "absolutely" could still have carried out the first phase of the plan and installed the upstream sheet pile wall on the east end of the embankment. (Ex. A, Lee Mueller Tr., 33:8–34:12.)  Mr. Mueller acknowledged that Boyce Hydro believed that part of the embankment might fail if there was "an elevated pond." (Ex. A, Lee Mueller Tr, 34:5–34:12.)  But Boyce Hydro did not install the sheet pile wall, apparently because the Federal Energy Regulatory Commission (FERC) did not explicitly order it to do so.  (Ex. A, Lee Mueller Tr., 33:18–33:24.)  There is no indication in the record that Mr. Mueller informed FERC of Boyce Hydro's concerns about the ability of the eastern embankment to withstand an elevated water level.

In 2012, Boyce Hydro constructed an embankment overlay on the downstream side of the *western* end of the embankment, and in 2014, it placed additional "buttress fill" in that same location.  (Ex. 1 to Ex. A Lee Mueller Tr, Dam

Modifications.)  But Boyce Hydro did not do anything to strengthen the *east* end of the embankment that it recognized might fail in the event of an elevated water level.

### Boyce Hydro spent significant time and money on projects unrelated to operating a hydroelectric dam.

Boyce Hydro did find time and significant resources to perform side projects unrelated to the operation of a hydroelectric dam.  Mr. Christie, Boyce Hydro's dam safety engineer and chief operator, testified that by the time Boyce Hydro took over the Edenville Dam, "FERC was concerned" that so much time had passed "without anybody doing anything to try to increase the [spillway] capacities," and he told Mr. Mueller that "we got to start showing some action here."  (Ex. F, Christie Tr., 40:22–42:21.)  Mr. Mueller testified that he believed Mr. Christie was "truthful" and that he trusted Mr. Christie "implicitly."  (Ex. A, Lee Mueller Tr, 23:19–23.)  But instead of adopting Mr. Christie's recommendations, Boyce Hydro "delayed the whole process" because Mr. Mueller had "developed a grandiose plan" of cutting into the Edenville Dam's embankment to create "a huge marina" to serve as a "cash project for . . . Boyce Hydro."  (Ex. F, Christie Tr., 40:22–42:21.)  Mr. Christie tried to talk Mr. Mueller out of it, explaining that digging a marina into an earthen embankment would "introduce some serious concerns about dam failure," but Mr. Mueller insisted on repeatedly taking it to FERC, which finally shut down the idea. (*Id*.)  The "marina" idea delayed the capacity increase efforts "for a year or two." (*Id*.)

Shortly after the marina idea was rejected by FERC, in about 2008, Boyce Hydro "spent almost a half a million dollars trying to put on a music festival" at the Edenville Dam.  (Ex. F, Christie Tr, 56:9–13; 59:17–20.)  Mr. Christie noted that he "could've built the [interim] spillway" he had designed with that kind of money. (Ex. F, Christie Tr, 80:12–14.)

By 2015, Mr. Christie had spent "about a year" with Boyce Hydro developing plans to construct an "interim spillway" that "would pass some significant flow," and the "board of consultants had signed off on it," and the project was "ready to start construction in 2015."  (Ex. F, Christie Tr, 11:6–13:18.)  But then at the last minute, Boyce Hydro changed the design because Mr. Mueller also wanted to build "a large travel trailer park on the dam."  (*Id*.)  Boyce Hydro came up with an "overwhelming" design that stymied the project, dramatically increased its cost, and further delayed the effort to increase the dam's spillway capacity.  (*Id*.)  Mr. Christie at that point refused to be the "project manager" for the project, telling Mr. Mueller:  "this is your design, I don't agree with it, and I'm not going to do any more design work for you.  If you want to build this, you run it."  (Ex. F, Christie Tr, 78:8– 20; 88:6–14.)

Mr. Christie observed that Boyce Hydro routinely pursued expensive endeavors unrelated to the operation of the dam.  He testified that Boyce Hydro purchased "a $50,000 sawmill" just so it could cut lumber for a short period of time. (Ex. F, Christie Tr, 56:9–60:5.)  Boyce Hydro also purchased "dump trucks and [a] bulldozer and skid steers and backhoes," and built a "very nice pole barn to keep

them in." (*Id.*)  Boyce Hydro was regularly "building roads and cutting trees and regrading areas," including building a new and unnecessary "parking lot" and performing "a lot of earth moving," all of which cost "a lot of money." (*Id.*)  Mr. Christie and "the guys that were operating the facilities" expressed concerns to one another, wondering "Why are we doing all this construction work?" (*Id.*)  Mr. Christie testified that "everyone that worked there, you know, were just kind of shaking their heads. 'Why are we putting on a music festival?  Why are we building these roads and doing all this logging on some of the property we got?'" (Ex. F, Christie Tr., 93:4–11.)  Mr. Christie tried to explain to Mr. Mueller that "You're in the hydro business now, you got to pay attention here," and "concentrate on being in the hydro business, you got to pay attention to FERC." (Ex. F, Christie Tr, 57:22–60:5.)  Mr. Mueller replied that "I'm not in the hydro business . . . I'm in the money-making business." (*Id.*)

Mr. Christie finally hit his "tipping point" in 2017 and resigned his position. (Ex. F, Christie Tr., 87:5–93:3.)  Boyce Hydro "owned 11 or 12 acres at Smallwood" and "wanted to dig a huge pond in the middle of that 12 acres, construct a canal going out into the impoundment . . . and then develop a subdivision around that," even though the "property was 30 feet above the lake level." (Ex. F, Christie Tr., 14:2–12; 58:22–59:16.)  The project was unrelated to hydroelectric operations, yet Boyce Hydro was using Boyce Hydro staff to perform the construction. (*Id.*)  In the meantime, Mr. Christie had identified a "major problem" with hydroelectric operations related to a gate at the Sanford Dam that needed immediate repair over

the winter of 2016–2017.  (Ex. F, Christie Tr., 90–91.)  Mr. Christie had lined up the

work tasks and helped arrange to obtain the materials to perform the work.  (*Id.*)

Each time Mr. Christie visited the site over the winter, there was no sign Boyce

Hydro was working on the Sanford gate.  Instead, "every time I went back, they

were digging this pond up at . . . Smallwood, and trying to get down deep enough to

dig a channel to the pond."  (Ex. F, Christie Tr, 92:1–10.)  Mr. Christie determined

"'This is it.' I said, 'Enough problems. I mean there are a bazillion problems around

here, but if they're not going to address the immediate concerns, I'm done.'"  (*Id.*)

Mr. Christie resigned in May 2017.  (Ex. F, Christie Tr., 87:5.)

FERC revoked Boyce Hydro's license to generate electricity at the Edenville

Dam on September 10, 2018, noting among other things, Boyce Hydro's refusal to

spend its money on actually increasing the spillway capacity of the dam, rather

than just planning for it.  164 FERC ¶ 61,178, at *1–*4.  FERC noted that Boyce

Hydro "refused to provide basic information regarding its financial resources," and

therefore had "not substantiated its claims regarding financial hardship with

evidence." 164 FERC ¶ 61,178, at *12.

**The eastern end of the embankment that Boyce Hydro thought would fail
did fail.**

Once FERC revoked Boyce Hydro's license to generate electricity, the

Edenville Dam fell under the jurisdiction of EGLE—just like more than 1,000 other

dams in Michigan.  Mr. Mueller did not believe that Michigan law required Boyce

Hydro to take any action to increase the spillway capacity of the Edenville Dam.

(Ex. B, State Court Judgment, ¶ 7.)  Consistent with that belief, Mr. Mueller never expressed to his employees or to Plaintiffs that Boyce Hydro considered it unsafe to maintain the normal level of Wixom Lake "without first increasing the spillway capacity of the Edenville Dam."  (Ex. B, State Court Judgment, ¶¶ 12, 19.)  So, when Lee Mueller "lowered Wixom Lake more than three feet below its normal level beginning in November 2019," it was not because he "believed that it would be unsafe to maintain the normal level of Wixom Lake without increasing the spillway capacity of the Edenville Dam."  (Ex. B, State Court Judgment, ¶ 14.)  It was because he "thought doing so would be a more effective way of managing ice buildup over the winter months."  (*Id.*)  Boyce Hydro always intended "to return Wixom Lake to its normal level in the spring of 2020."  (Ex. B, State Court Judgment, ¶ 15.)  And Boyce Hydro did so on May 4, 2020.  (Ex. B, State Court Judgment, ¶ 18.)

On May 19, 2020, after a multi-day rainstorm raised the level of Wixom Lake to a record level, the east end of the Edenville Dam's embankment failed due to "static liquefaction."  (5/4/2022 Report, PageID.3581.)  Essentially, loose soil within the east embankment became so saturated with water that it lost integrity and acted like a liquid instead of a solid.  (Ex. F., Dr. Olson Declaration, ¶ 1.)  The water in the reservoir did not run over the top of the Edenville Dam—the dam's spillways were still passing enough water to keep that from happening.  (5/4/2022 Report, PageID.3584; Ex. F, Olson Report, at 3.)  But the water level rose to a high enough level for a long enough period of time that it triggered the liquefaction within the soils of the east, or "left," embankment.  (Ex. F, Olson Report, at 3–5.)  Mr. Mueller

confirmed that the section of the east embankment that failed was the section of the embankment that Boyce Hydro identified in 2010 as potentially not being able to withstand the pressure of an elevated water level.  (Ex. A, Lee Mueller Tr, 28:7–28:15 and Ex. 1 to Mueller Tr., Dam Modifications (with highlighted circle in bottom right).)

The failure of the east embankment of the Edenville Dam sent a gush of water downstream that overwhelmed the Sanford Dam, also causing water to overtop its embankment.  (PageID.3581.)  FERC issued an emergency order requiring Boyce Hydro to "fully lower" the reservoir behind the Sanford Dam.  (Ex. G, 5/20/2020 FERC Order.)

The dramatic loss of water from Wixom Lake behind the Edenville Dam, and the loss of water behind the Sanford Dam, effectively destroyed the Village of Sanford and flooded hundreds of homes and other buildings, causing a devastating impact on the people in the community.  (First Amend. Comp. ¶ 83, PageID.2543; Ex. L, Matousek Declaration, ¶¶ 7, 9, 14; Ex. M, Brooks Declaration, ¶¶ 7, 9–11.) Fortunately, there "were no fatalities or serious injuries" to people.  (5/4/2022 Report, PageID.3590–3591.)  But that is because the Midland County emergency manager did not follow Boyce Hydro's "inconsistent and contradictory" emergency action plan.  (*Id.*)  Had the emergency manager "strictly" followed Boyce Hydro's plan, "it is entirely possible that lives would have been lost."  (*Id.*)

The failure of the east embankment of the Edenville Dam also caused significant natural resource damage.  It caused approximately $21 million in

damages to the fishery (Ex. H, Jolley Report, at 1), and approximately $91 million in damages to the freshwater mussel ecosystem (Ex. I, Gulotty Report, at 17).  The "deluge" from the failure "also washed large amounts of potentially contaminated sediments, debris, garbage, and other harmful substances into the waters of the State, regulated bottomlands, regulated floodplains, and . . . regulated wetlands." (First Amend. Comp. ¶ 84, PageID.2543; Ex. L, Matousek Declaration; Ex. M, Brooks Declaration.)

**Boyce Hydro could have prevented the failure of the east embankment of the Edenville Dam.**

As the Court is already aware, both FERC and EGLE ordered Boyce Hydro to hire a team of independent engineers to investigate the failure of the Edenville Dam.  (8/26/2022 Order, PageID.4422–4426.)  Boyce Hydro selected the engineers, and believed they were "competent and qualified in their fields."  (Ex. A, Lee Mueller Tr, 8:20–10:10.)  The only reason that FERC ended up paying them for their work is because Boyce Hydro would not do so.  (8/26/2022 Order, PageID.4422.)  Once the team of engineers began their work, they became known as the Independent Forensic Team (Team).  Mr. Mueller explained that he regularly provided the Team with "truthful" information, that he was "candid and forthcoming" with them and "at no time" did he provide them with "incorrect or untruthful information."  (Ex. A, Lee Mueller Tr., 9:2–10:10.)

As explained above, as early as 2010, Mr. Mueller acknowledged that Boyce Hydro believed the east embankment might fail if there was "an elevated pond."

(Ex. A, Lee Mueller Tr, 34:5–34:12.)  The letter describing this meeting is one of the letters Mr. Mueller sent to the Team.  (Ex. 2 to Ex. A, Mueller Tr, 11/17/2021 Email.)  Boyce Hydro developed a plan to "install sheet piling from the very east end of the Edenville Dam all the way . . . to the existing concrete spillways" on the upstream side of the dam.  (Ex. A, Lee Mueller Tr, 24:24–25:19.)  The purpose was to, among other things, create "a cut off wall . . . for water flow."  (*Id*.)  If Boyce Hydro had done so, the "cutoff wall" would have "reduce[d] and slow[ed] seepage through the embankment and any natural foundation sands present above the hardpan, particularly under the transient increases in reservoir water level during the May 2020 flood."  (Ex. F, Olson Report, at 6.)  According to Dr. Olson, "the sheet pile wall would have been more likely than not to have prevented the failure" of the Edenville Dam.  (*Id*.)

But installing the sheet pile wall on the upstream side of the east embankment was not the only way Boyce Hydro could have prevented the dam failure.  "Any effort to reduce the static shear stresses in the downstream slope would have decreased the potential for triggering static liquefaction."  (Ex. F, Olson Report, at 5.)  Dr. Olson reviewed the Team's report, in which the Team concluded that strengthening the downstream embankment would have prevented the dam failure and agreed that "constructing a downstream buttress (i.e., stabilizing berm) similar to that constructed in other areas of the Edenville embankment . . . would have prevented static liquefaction failure . . . to a reasonable degree of certainty."  (Ex. F, Olson Report, at 5–6.)  The Team even concluded that there was no question

11

that Boyce Hydro "would have been able to afford" that type of buttressing, since it had performed that type of work on other parts of the embankment. (5/4/2022 Report, PageID.3581.)

Dr. Olson also agreed with the Team's conclusion that if Boyce Hydro would have installed "an upgraded spillway system designed to handle the probable maximum flood," it "would have limited reservoir water levels to elevations lower than historical highwater levels . . . and would have prevented the May 19, 2020, static liquefaction flow failure." (Ex. F, Olson Report, at 5.) Boyce Hydro spent "over 14 years" promising FERC that it would install such a system, but never did so. *Order Revoking License,* 164 FERC ¶ 61,178 (September 10, 2018), at *1–*4.

Notably, the Team also examined potential actions Boyce Hydro could have taken that *would not* have prevented the failure. (5/4/2022 Report, PageID.3665–3667; Ex. K, Trumble Report.) For example, the Team considered whether it would have made a difference if Boyce Hydro had kept Wixom Lake at its winter 2019/2020 level. (Ex. K, Trumble Report, at 3–6.) As explained above, Boyce Hydro did not actually consider that option because it had always planned to return Wixom Lake to its normal level by spring 2020 and did so by May 4, 2020. (Ex. B, State Court Judgment, ¶¶ 15, 18.) But *even if* Boyce Hydro had kept the water at its winter 2019/2020 level, the Team concluded that it "would have resulted in less than 0.2 feet difference in the peak leak level," so it was "unlikely to have prevented the failures." (Ex. K, Trumble Report, at 4, referring to 5/4/2022 Report, PageID.3667, PageID.6730.) In other words, "if the lake had been kept lower by

12

this amount until the May 2020 flood occurred, the effect on the lake level on May 19, by itself, would very likely have been too small to prevent the dam failure." (Ex. K, Trumble Report, at 4, referring to 5/4/2022 Report, PageID.3667, PageID.6730.)

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Because Plaintiffs are moving for summary disposition on their claims for which they have the burden of persuasion, to show that they are entitled to judgment as a matter of law, they "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable [fact finder] would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) (citation omitted).  To support their claims, Plaintiffs must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

If Boyce Hydro wishes to instead go to trial on the claims, it also must either cite to "particular parts" of the record to demonstrate that there is a genuine dispute that needs to be tried or show that a trial is needed because "the materials cited" by Plaintiffs "do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(C)(1).  Boyce Hydro cannot merely point to its answer. *Anderson v.*

13

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Instead, it must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993).

Importantly, at the motion stage, the "material" cited by Plaintiffs "may be presented in a form that would not, in itself, be admissible at trial." 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.), *citing Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), as revised (July 5, 2017).  So, it is not enough for Boyce Hydro to simply argue that the materials in the record cited by Plaintiffs may not be in an admissible *form*.  The question for the Court is only whether the material *could* "be presented in a form that would be admissible" if there were a trial.  Fed. R. Civ. P. 56(c)(2).  *See also Lee*, 859 F.3d at 355; *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (despite the "general rule" that "inadmissible hearsay cannot be considered on a motion for summary judgment," a "district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form") (citations omitted).

14

## ARGUMENT

**I.    Boyce Hydro is barred from relitigating issues resolved by a final judgment in state court.**

The doctrine of collateral estoppel dictates that a "question that is put in issue and decided by a court of competent jurisdiction cannot be disputed in a subsequent action between the same parties, even if the subsequent suit alleges a different cause of action." *Lopez v. Union Carbide Corp.*, 83 F. Supp. 2d 880, 884 (E.D. Mich. 2000).  When the doctrine is asserted in federal court and the prior judgment was from a state court, "federal courts must apply the preclusion law of the state in which that prior judgment was rendered."  *Id.* (citation omitted).

Here, the parties were also parties to a state court case.  (Ex. B, State Court Judgment.)  Plaintiffs moved for summary disposition in that case as to 19 discrete issues, arguing that they were not genuinely in dispute.  (*Id.*)  Plaintiffs attached 41 exhibits to their motion in the state court, including deposition transcripts and many other types of evidence.  In response, Boyce Hydro did not attach a single exhibit or even cite to any evidence in the record, nor did they argue that a trial on any of the issues was necessary.  The state court held two hearings on Plaintiffs' motion and entered a final judgment against Boyce Hydro on March 8, 2023.  (Ex. B, State Court Judgment.)

There is no need for this Court to reexamine the 41 exhibits Plaintiffs presented in state court to which Boyce Hydro had no response.  In Michigan, the doctrine of collateral estoppel applies to prevent "relitigation of an issue in a subsequent, different cause of action between the same parties when the prior

proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 340, 657 N.W.2d 759, 782 (2002) (citations omitted).  The "previous litigation must have presented a full and fair opportunity to litigate the issue presented in the subsequent case." *Id.* (citations omitted).  And when the doctrine is asserted offensively, as here, there must not only be "mutuality"—which is that the person invoking the doctrine would have been bound by the previous judgment if it had gone against them—but the parties in the two lawsuits must be "identical." *Knoblauch v. Kenyon*, 163 Mich. App. 712, 720, 415 N.W.2d 286, 290 (1987).

Each of the elements are satisfied here.  There is mutuality and the parties are identical.  Boyce Hydro had a full opportunity to respond to Plaintiffs' motion and make arguments in two different hearings.  And the issues identified in the Statement of Facts section above are identical to several of the issues in this litigation, including when and why Boyce Hydro changed the levels of Wixom Lake leading up to the failure of the dam.  Boyce Hydro is barred from trying to relitigate the issues in this Court.  This is precisely the situation in which the doctrine of collateral estoppel should apply.  Applying it here will not only "relieve parties of multiple litigation," but it will "conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."  *Keywell*, 254 Mich. App. at 341.

## II.     Boyce Hydro is responsible for the failure of its dam, which resulted in the violation of multiple environmental laws.

Michigan's Natural Resources and Environmental Protection Act (NREPA)

contains dozens of parts, and as explained below, Boyce Hydro violated many of

them.

### A.     Boyce Hydro violated Part 315 of NREPA (Dam Safety).

Part 315 of NREPA governs the construction, operation, or alteration of dams

in Michigan.  Mich. Comp. Laws § 324.31501 *et seq.*  It does not apply to a dam that

is regulated by FERC.  Mich. Comp. Laws § 324.31506(2)(a).  But as noted above,

FERC revoked Boyce Hydro's license, which means that approximately 20 months

before the dam's failure, it became one of the more than 1,000 other dams in

Michigan regulated by EGLE.  Boyce Hydro, therefore, had an obligation to comply

with Part 315, which required it to "advise [EGLE] and the affected off-site public

authorities and safety agencies of any . . . unusual or alarming circumstance or

occurrence existing or anticipated that may affect the safety of the dam . . . ."  Mich.

Comp. Laws § 324.31520(1).  It did not do so.

As explained above, Boyce Hydro knew for at least 10 years before its dam

failed that the part of the dam that failed was susceptible to failure if lake levels got

too high.  (Ex. 2 to Ex. A, Mueller Tr, 11/17/2021 Email.)  That is exactly what

happened.  (Ex. A, Lee Mueller Tr, 28:7–28:15 and Ex. 1 to Mueller Tr., Dam

Modifications (with highlighted circle in bottom right).)  Boyce Hydro designed a

sheet pile cutoff wall to address the problem.  (Ex. A, Lee Mueller Tr, 24:24–25:19.)

And Boyce Hydro admits that it "absolutely" could have installed the sheet pile

cutoff wall.  (Ex. A, Lee Mueller Tr, 33:8–34:12.)  But it did not do so because FERC did not explicitly order it to do so.  (*Id*.)  There is no evidence Boyce Hydro informed FERC of the defect.  Regardless, Mr. Mueller acknowledges that Boyce Hydro believed the east embankment might fail.  (Ex. A, Lee Mueller Tr, 34:5–34:12.)  If Boyce Hydro had installed the sheet pile cutoff wall it designed, Dr. Olson opined that it would "more likely than not" have prevented the failure of the embankment. (Ex. F, Olson Report, at 6.)

As explained in the Statement of Facts section, Boyce Hydro also could have prevented the failure of the Edenville Dam by either strengthening the downstream side of the eastern embankment or constructing the spillway project that it promised FERC for 14 years it would construct.  It simply chose not to do either of those projects.  Instead, Boyce Hydro wasted its time and resources on a failed music festival, unneeded sawmill, extracurricular construction projects, ill-fated plans to transform its dam into a marina or RV park, and—the final straw for its long-serving dam safety engineer—trying to dig a pond for a housing subdivision rather than fix a critical safety defect on one of its dams.  (Pages 4–13 above.)

Boyce Hydro did not share with EGLE its concern that the east embankment might fail or explain its plan to install the cutoff wall to address the problem.  It kept that concern to itself, never installed the cutoff wall, nor did it take any other action to strengthen the east embankment.  That was a violation of Part 315.  Had Boyce Hydro shared its concern with EGLE as Part 315 required and if Boyce Hydro was not willing to take "the required remedial action" on its own initiative, EGLE

18

could have ordered it to do so.  Mich. Comp. Laws § 324.31524(2).  But EGLE could not act on information that Boyce Hydro unlawfully withheld.  There is no genuine dispute about whether Boyce Hydro withheld from EGLE and others information that Part 315 required it to divulge.  Mich. Comp. Law § 324.31520(1)

## B.   Boyce Hydro violated Part 17 of NREPA (Environmental Protection).

Part 17 of NREPA authorizes a suit "for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." Mich. Comp. Laws § 324.1701(1).  Once Plaintiffs, as they have done here, show "that the conduct of the defendant has polluted, impaired, or destroyed . . . the . . . water, or other natural resources or the public trust in these resources," Mich. Comp. Laws 324.1703(1), the "court shall adjudicate the impact of the defendant's conduct on the . . . water, or other natural resources, and on the public trust in these resources, in accordance with this part."  Mich. Comp. Laws § 324.1704(3).

Boyce Hydro could, of course, submit "evidence to the contrary," to try to show that its conduct has *not* caused massive harm to Michigan's public resources. Mich. Comp. Laws § 324.1703(1).  But it has no evidence of that nature to submit. It did not identify any experts or provide any expert reports.  And the evidence against Boyce Hydro is overwhelming.

Even so, Boyce Hydro could perhaps try to "show, by way of an affirmative defense, that there is no feasible and prudent alternative to [its] conduct," and that

19

Boyce Hydro's "conduct [was] consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." Mich. Comp. Laws § 324.1703(1). Perhaps that is the affirmative defense Boyce Hydro had in mind in its answer, when it asserted that it "acted in good faith and had a reasonable belief that [it was] not in violation of any natural resources law." (PageID.2688.) But there is no way Boyce Hydro can successfully support that affirmative defense.

As explained in detail above, there *was* a "feasible and prudent alternative" to ignoring the problem with the dam's eastern embankment that Boyce Hydro first identified in 2010: *Boyce Hydro could have fixed the problem.* It could have installed the upstream cutoff wall, it could have constructed a downstream buttress, or it even could have constructed the spillways that it promised FERC for over 14 years that it would construct. There is no way Boyce Hydro could show that *failing* to select any of these alternatives, and instead ignoring the problem with the east embankment of its dam, was "consistent with the promotion of the public health, safety, and welfare." Mich. Comp. Laws § 324.1703(1).

There is no genuine dispute as to whether Boyce Hydro's conduct polluted, impaired, or destroyed Michigan's "water, or other natural resources or the public trust in these resources." Mich. Comp. Laws § 324.1703(1). The Court, therefore, should enter an order under § 324.1704(3) declaring that Boyce Hydro is, in fact, responsible for the impacts on Michigan's natural resources, including those documented in Exhibit L.

### C.     Boyce Hydro violated Part 31 of NREPA (Water Resources).

Part 31 is aimed at protecting water resources in general and provides for both civil and criminal penalties.  Mich. Comp. Laws § 324.3115.  Boyce Hydro has violated it in at least three ways.

First, a person cannot "fill or grade or permit the filling or grading [of] . . . a floodplain, stream bed, or channel of a stream" without a permit.  Mich. Comp. Laws § 324.3108(1).  As explained above, Boyce Hydro is responsible for the failure of its dam, and that failure caused the filling of stream beds, floodplains, and stream channels.  (Ex. L, Matousek Declaration, ¶¶ 7, 10; Ex. M, Brooks Declaration, ¶¶ 7, 8, 12.)

Second, without a permit, a person cannot "undertake or engage in an activity on or with respect to land that is determined by the department to interfere harmfully with the discharge or stage characteristics of a stream."  Mich. Comp. Laws § 324.3108(1).  The failure of Boyce Hydro's dam interfered harmfully with the discharge characteristics of the Tobacco and Tittabawassee Rivers and many of their tributaries.  (Ex. L, Matousek Declaration, ¶¶ 7, 10, 11, 13; Ex. M, Brooks Declaration, ¶¶ 7, 12.)

Finally, without a permit, a person cannot "directly or indirectly discharge" a "substance that is or may become injurious . . . into the waters of the state."  Mich. Comp. Laws § 324.3109(1).  A substance is "injurious" if it impairs "the public health, safety, or welfare," the "value of riparian lands," the "commercial [or] recreational" use of the waters, the welfare of "wild animals, birds, fish, aquatic life, or plants," or the "value of fish and game."  *Id*.  Plainly, as documented above, Boyce

Hydro has discharged injurious substances into the waters of the state. Not only did the failure of their dam injure the value of fish and aquatic life, but it also dramatically impaired the recreational value of Wixom and Sanford Lakes, it harmed the value of the riparian lands bordering Wixom and Sanford Lakes, and the deluge endangered the public's health and safety. (Ex. H, Jolley Report; Ex. I, Gulotty Report; Ex. L, Matousek Declaration, ¶¶ 7–11, 14; Ex. M, Brooks Declaration, ¶¶ 7, 10, 12; First Amend. Comp. ¶¶ 82–93, PageID.2542–2545.)

### D.    Boyce Hydro violated Part 301 of NREPA (Inland Lakes and Streams).

Part 301 protects the integrity of inland lakes and streams. Inland lakes include not only naturally formed lakes, but impoundments, such as Wixom and Sanford Lakes. Mich. Comp. Laws § 324.30101(i). A person cannot "diminish an inland lake or stream" without a permit. Mich. Comp. Laws § 324.30102(1)(d). Nor can a person "fill bottomland" without a permit. Mich. Comp. Laws § 324.30102(1)(a). Bottomland is "the land area of an inland lake or stream that lies below the ordinary high-water mark." Mich. Comp. Laws § 324.30101(a). As demonstrated above, Boyce Hydro plainly did both. Boyce Hydro's dam—which it controlled—dramatically diminished Wixom Lake without a permit. (Ex. L, Matousek Declaration, ¶¶ 7, 8, 12–14; Ex. M, Brooks Declaration, ¶ 10; 5/4/2022 Report, PageID.3619–3639; First Amend. Comp. ¶¶ 82–93, PageID.2542–2545.) And the deluge from the failure of Boyce Hydro's dam deposited a large amount of unauthorized material on bottomland of both Sanford Lake and other water bodies

downstream of the Edenville Dam.  (Ex. L, Matousek Declaration, ¶¶ 7, 8, 10, 11; Ex. M, Brooks Declaration, ¶¶ 7, 8, 10, 12.)

## CONCLUSION AND RELIEF REQUESTED

Boyce Hydro is responsible for one of the worst dam failure disasters in Michigan history.  It could have prevented the failure of its dam, but it was too distracted pursuing non-dam-safety-related ventures to strengthen the east embankment of the dam that failed—the very area it identified as a weak point as far back as 2010.  This was an entirely preventable disaster if Boyce Hydro had focused its time and resources in a responsible manner.

Plaintiffs request that the Court enter an order under 28 U.S.C. § 2201(1) that declares the following:

1. Boyce Hydro owned and controlled the Edenville Dam beginning in 2006, and up to and including the date its east embankment failed on May 19, 2020.

2. Boyce Hydro violated Part 315 of NREPA because it was aware of a defect in the east embankment of the Edenville Dam that could affect the safety of the dam, but it neither divulged that information to EGLE nor repaired the defect.

3. Boyce Hydro violated Part 17 of NREPA because its conduct of not repairing the defect in the east embankment of its dam caused the pollution and destruction of Michigan's natural resources, and it had

feasible and prudent alternatives to its conduct:  it could have repaired the defect.

4. Boyce Hydro violated Part 31 of NREPA by filling or allowing the filling of stream beds, floodplains, and stream channels; harmfully interfering with the discharge characteristics of the Tobacco and Tittabawassee Rivers and many of their tributaries; and discharging injurious substances into the waters of the state—all without a permit.

5. Boyce Hydro violated Part 301 of NREPA by diminishing Wixom Lake without a permit and depositing unauthorized material on bottomland of both Sanford Lake and other water bodies downstream of the Edenville Dam—all without a permit.

Despite Boyce Hydro's shocking culpability, Plaintiffs recognize that the bankruptcy plan confirmed by the U.S. Bankruptcy Court for the Eastern District of Michigan prevents Plaintiffs from pursuing the substantial civil fines available under NREPA, or other damages, against Boyce Hydro.  Accordingly, Plaintiffs request that once it enters the declaratory relief requested by Plaintiffs, the Court determine under Rule 54(b) that there is no just reason for delay, and make its declaratory judgment final as to Boyce Michigan, LLC, Boyce Hydro Power LLC, Boyce Hydro, LLC, WD Boyce Trust 2350, WD Boyce Trust 3649, and WD Boyce Trust 3650.

Respectfully submitted,

Dana Nessel
Attorney General

/s/ *Nathan A. Gambill*
Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
Attorneys for Plaintiffs
Michigan Department of Attorney
General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

Dated:  May 25, 2023

LF:  Dam-Mueller, Boyce Hydro (EGLE & DNR v)/AG# 2020-0291918-C-L/Plaintiffs' Brief in Support of Motion for Summary Judgment 2023-05-25

**CERTIFICATE OF COMPLIANCE**

As required by LCivR 7.2(b)(ii), the number of words in this brief as defined by LCivR 7.2(b)(i) is 6,548.  The brief was prepared using Microsoft Word for Office 365.

<div style="margin-left:50%">

Respectfully submitted,

Dana Nessel
Attorney General

*/s/ Nathan A. Gambill*
Nathan A. Gambill (P75506)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
Attorneys for Plaintiffs
Michigan Department of
Attorney General
Environment, Natural Resources,
and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
gambilln@michigan.gov
allisonyokomd@michigan.gov

</div>

Dated:  May 25, 2023